1  Etan Z. Lorant, Esq., SBN: 108820
   LAW OFFICES OF ETAN Z. LORANT
2  5850 Canoga Avenue, Suite 400
   Woodland Hills, CA 91367
3  (818) 990-3990

4

5  Attorneys for Plaintiff,
   J.W., A Minor, through her Guardian Ad Litem, MARK WILSON
6

7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10

11  J.W. A Minor, through her Guardian          )    **CASE: CV 07-06191**
    Ad Litem, MARK WILSON                       )            **GPS(SHx)**
12                                              )
                    Plaintiffs,                 )    **PLAINTIFF'S OPPOSITION**
13                                              )    **TO DEFENDANT MARTIN**
                                                )    **POLO'S MOTION IN**
14                                              )    **LIMINE NO. 5**
                                                )
15                                              )
    vs.                                         )
16                                              )
    CITY OF OXNARD, MARTIN POLO,                )    **Date: September 22, 2008**
17  and DOES 1 through 10,Inclusive,            )    **Time: 11:00 a.m.**
                                                )    **Courtroom: "7"**
18                                              )
                                                )
19                  Defendants.                 )    **The Honorable Judge**
                                                )    **George P. Schiavelli**
20                                              )
                                                )
21                                              )
                                                )
22  ————————————————————————————
    \\\
23
    \\\
24
    \\\
25
    \\\
26
    \\\
27
    \\\
28  \\\

                          -1-

**PLAINTIFF'S OPPOSITION TO DEFENDANT**      **CASE# CV 07-06191 GPS(SHx)**
**MARTIN POLO'S MOTION IN LIMINE NO. 5**

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

Plaintiff J.W. was a12-year-old minor at the time of the underlying incident herein. She was *sexually assaulted and raped* by Defendant Officer POLO in the "Beat 21" Substation/ Storefront of the Oxnard Police Department on August 15, 2006 in the afternoon hours.

The child had called Officer Polo for assistance, and Officer POLO improperly picked her near her mother's house, and drove her to the isolated and unmanned Beat 21 Substation/Storefront at the early afternoon hours of August 15, 2006.  At first, Defendant Officer POLO, offered the child money to engage in sex with him, and when the minor refused, he proceeded to sexually force himself on her in the backroom of said Substation.

Plaintiff J.W. also alleges that Defendant City of Oxnard failed to properly supervise, train and discipline Officer POLO prior to the incident, and that some Officers of Defendant City of Oxnard who had access to the Beat 21 Substation were in the habit, custom and practice of using the isolated Substation, and in particular the private backroom, for sexual activities.

Although Defendants deny J.W.'s allegations, there are numerous indications and evidence that support her allegations.

-2-

## II.

## MARIA T. LYMBERIS, M.D., SHOULD BE ALLOWED TO REBUTT DR. WILSON BY TESTIFYING THAT IT IS NORMATIVE FOR SEXUAL ABUSE VICTIMS TO HAVE PROBLEMS REPORTING THEIR SEXUAL ABUSE

There is no dispute that Plaintiff timely designated Maria T. Lymberis, M.D., as a rebuttal expert. However, Defendant POLO wishes to exclude evidence and testimony concerning the fact that it is normative for sexual abuse victims to have a problem disclosing or admitting to their sexual abuse.

Defense psychiatric expert, Dr. Stephen Wilson, opined that the young Plaintiff's failure to disclose her rape is 'highly out of the ordinary'. He specifically stated regarding Plaintiff JW in his Rule 26 Report, no. 5, last paragraph: "In my opinion, if the description of sexual assault is not volunteered, then when questioned directly, information would have been elicited regarding a sexual assault because at those three admissions it would have been "fresh in mind," and **not to do so is highly out of the ordinary"**. (Emphasis added.). Attached herewith as Exhibit "A" are a true and correct copies of the relevant pages of Dr. Wilson's report.

\\\

-3-

Dr. Lyberis rebutted Dr. Wilson's opinion that a non-disclosure is highly out of the ordinary by stating in her Section VII (2) that: "**It is normative for victims of sexual abuse to deny and have great difficulty disclose their abuse**" (Emphasis added), and in VII (1): "I do not consider JW to be a social deviant or psychopath who lies and fabricates. All evidence indicates she is reliable and credible historian **provided** she is in a safe, supportive, trustworthy environment." Attached herewith as Exhibit "B" are a true and correct copies of the relevant pages of Dr. Lyberis's report.

Defendants wish to protect their expert from being rebutted. Fortunately for the young Plaintiff, she has a full right under FRCP 26(a)(2)(C) to rebut Dr. Wilson's opinions, and Defendants cannot prejudice her by attempting to exclude Dr. Lyberis from testifying.

Furthermore, Plaintiff timely and properly designated Plaintiff's treating physicians and/or health care providers as rebuttal expert witnesses (Exhibit "C", a true and correct copy of Plaintiff's Designation). Counsel for Plaintiff anticipates that at least one of JW's physicians would testify in rebuttal to Dr. Wilson's opinions based upon his own examination and treatment of J.W.

Specifically, when asked if its true that some minors do not report their rape as soon as it happens, Dr. Ronald Sager, JW's treating psychiatrist testified referring to JW in his deposition that: "Correct. .." (See attached as Exhibit "D" are

-4-

true and correct copies of relevant pages from Dr. Sager's deposition transcript, pages 1, and 36-37).

When Dr. Sager was asked: "The question is, in your experience as a doctor, if a 12 year old minor does not report immediately that something happened, that she was raped, and she waits two or three weeks and tells her mother something bad happened with somebody, and then later on she reports it to somebody else saying "somebody did something bad to me," that would not be an abnormal situation; is that correct?" Dr. sager responded: "It's common, let's say, not to report it. ..." (See Exhibit "D").

Plaintiff J.W. clearly has the right to use her treating physician's testimony in rebuttal to Dr. Wilson's opinion that lack of reporting is 'highly out of the ordinary'.

Furthermore, there are numerous police officers from the Oxnard Police Department who have been trained in investigations of sexual assault cases. Their testimony can also rebut Dr. Wilson's testimony. For example, Sr. Officer Ken Klopman testified in his deposition that it is very common for sexual assault victims to delay reporting. Attached herewith as Exhibit "E" are true and correct copies of relevant pages from Officer Klopman's deposition transcript.

\\\

\\\

PLAINTIFF'S OPPOSITION TO DEFENDANT          CASE# CV 07-06191 GPS(SHx)
MARTIN POLO'S MOTION IN LIMINE NO. 5

# III.

## CONCLUSION

Based upon the foregoing defense motion in limine should be denied in its entirety.

DATED: September 5, 2008       LAW OFFICES OF ETAN Z. LORANT

By: _____
ETAN Z. LORANT, ESQ.
Attorneys for Plaintiff,
J.W. , A Minor, through her Guardian
Ad Litem, MARK WILSON

-6-

# EXHIBIT "A"

STEPHEN J. WILSON, M.D.
PSYCHIATRY
DIPLOMATE AMERICAN BOARD
OF PSYCHIATRY AND NEUROLOGY

4165 THOUSAND OAKS BLVD.
SUITE 345
WESTLAKE VILLAGE, CA 91362
(805) 373-6222
FAX (805) 496-5472

July 14, 2008

Mr. Jeffrey Held
Law Offices of Alan E. Wisotsky
300 Esplanade Drive, Suite 1500
Oxnard, CA 93036

Re:   J.W. v. City of Oxnard et al.

## RULE 26 REPORT

A.   **OPINIONS:**

1.   **The opinions in my report dated April 8, 2008 are incorporated here and a copy of my report is appended.**

2.   **J.W. is an unreliable historian and is known to lie, distort and exaggerate.**

Documentation consists of numerous notations in the reports from Vista Del Mar Hospital and the Youth Care/Pine Ridge Treatment Center, as well as the report of Robin K. Weiner, Ph.D., dated 11/25/06. Dr. Weiner notes, "She fabricated events and it was difficult for the interviewer to ascertain what information was factual and what was not." "She tended to fabricate and exaggerate answers, making it difficult to determine what was true.

Notes from her individual therapy at Youth Care/Pine Ridge, including a statement on 2/2/07 in which her father "expressed his concerns over her continued dishonesty." 1/11/07, noting she "lied about suicide attempts." A family therapy note of 11/16/06, in which father "reported [J's] dishonesty about stories she told to the police. It was noted, "C.T. [J.W.] dishonest about stories she told the police."

In addition, numerous nursing chart notes from Vista Del Mar Hospital, including 9/16/06, "makes untruthful statements" and 11/2/06, "is manipulative," 5/5/06, evidences "very sneaky behavior," 5/10/06, is "very gaming and manipulative."

**J.W. vs. County of Ventura**
July 14, 2008
Page 2

An admission note to Vista Del Mar Hospital dated 9/16/06, under the signature of Ronald Sager, M.D., noting that J.W. had told different stories to her mother and father and it was "unclear at this point what story is valid." A discharge summary from 10/3 to 10/18/06 notes, "She is very manipulative" and "very impulsive." An admission history of 10/3/06 under the signature of Atman Reyes, M.D., notes she "is an unreliable historian." Also, an admission note of 10/28/06 under the signature of Robert Auric, M.D., noting, "Patient is unreliable."

In the Minnesota Multiphasic Personality Inventory psychological assessments, by both Dr. Weiner and me, the tests were invalid due to exaggeration.

Another documentation of J.W.'s exaggeration and distortion is the notation in the deposition that she "had an IQ of 174" when the records from Dr. Weiner's psychological evaluation indicated a Full Scale IQ of 128.

In two separate sections of her deposition on two successive days, there are notations (pages 103 and 409) about whether the incident with Officer Polo actually occurred.

3.   **J.W. is manipulative and blames others for her difficulties.**

Dr. Weiner notes this on page 11 of her report, stating, "She continues to place blame on others and is unwilling to look at her behavior with objectivity." This is also documented repeatedly in the Youth Care/Pine Ridge treatment plans under family therapy and individual therapy.

A nursing note from Vista Del Mar Hospital, undated, states, "Feels parents put her here on purpose and she 'doesn't belong here.'" A note dated 10/31/06, "shows no insight into situation...will take little responsibility for her action and blames others."

4.   **J.W. is an unreliable historian.**

In her psychological evaluation, Dr. Weiner notes on page 3, "Both parents indicated that [J.W.] repeatedly lied and attempted to manipulate them with the threats of suicide and running away. [J.W.] also told her mother of several sexual assault incidents...her

**J.W. vs. County of Ventura**
July 14, 2008
Page 3

parents admitted that it was difficult to determine truth from fabrication with [J.W.] because she lied so convincingly."

Drs. Reyes, Ruths and Oreck all note her lack of reliability as a historian.

5.   **J.W.'s denial of sexual abuse.**

A psychiatric admission history dated 7/9/06 specifically notes, "Denies any history of physical or sexual abuse" (this is before the alleged incident). The admission history by Dr. Reyes of 8/27/06 notes, "She denies any history of physical or sexual abuse." In the medical history on the same date, under the signature of Howard J. Hoos, M.D., notes, "She recently had sex and is worried about pregnancy" *(my note: with no mention of any sexual assault, the date of which was documented to be 12 days prior)*. In admission history under the signature of Ronald Sager, M.D., dated 9/16/06, he notes, "Has had problems in her life since the age of 10 and has multiple symptoms such as cutting, anorexia, bulimia, suicidal ideation, suicide attempts, sexual acting out, and use of drugs."

On what appears to be the third admission to Vista Del Mar Hospital followed the alleged incident, in a discharge summary of 10/18/06 there is no mention of any sexual assault. It appears that the first statement about sexual assault by a police officer occurs on the admission of 10/28/06, and that's when the Suspected Child Abuse Report was tendered.

In three successive hospital admissions subsequent to the alleged sexual assault date of 8/15/06, there is documented data stating that sexual abuse was denied. This is an indication that even on questioning, no sexual assault was stated. In my opinion, if the description of sexual assault is not volunteered, then when questioned directly, information would have been elicited regarding a sexual assault because at those three admissions it would have been "fresh in mind," and not to do so is highly out of the ordinary.

6.   **DNA reports.**

The DNA reports by Justice Through DNA, dated 6/25/07 and 7/7/07 do not indicate a match with Officer Polo, but do identify numerous other partners.

J.W. vs. County of Ventura
July 14, 2008
Page 4

7.    **Current mental status.**

As per my report dated 4/8/08, it is my opinion that J.W. is functioning at or above her current grade level, as noted by her Mental Status Examination as well as the academic reports from Pine Ridge concerning her school performance. By her own acknowledgment in her deposition, her previous poor school performance was the result of her own disregard of an academic setting as well as her acknowledged drug use. From this I conclude that she is capable of functioning at her academic level.

8.    **Onset of psychological impairment.**

The medical records indicate the first intervention of a psychotherapeutic nature was at age 9 when she began to have difficulties in elementary school as well as to evidence social problems and her parents noted that she began increasingly concrete in her thinking (identified in developmental history of Dr. Weiner's report, page 2), and by the third grade the parents "indicated they saw signs of depression." It is my opinion this is clear data identifying that her psychological impairment predated the alleged 8/14/06 molestation by Officer Polo. In addition, in the medical records both from Youth Care as well as Vista Del Mar Hospital, it was indicated that she had previously been raped as recently as three days before the alleged incident with Officer Polo. It is my opinion that her sexual acting out, use of drugs, poor academic performance and repeated runaways are indicative of an ever-worsening emotional condition identified by her parents at least as far back as the second grade (7-8 years of age).

Taking the above information into consideration, it is my opinion that J.W. is an untellable historian, lies about circumstances in her life, is manipulative and blames others. In a family therapy session at Youth Care/Pine Ridge residential treatment center on 2/15/07, J.W. reported that "her interview with the [Oxnard] officer was 'not so good.' She said, 'I didn't have any evidence [of sexual assault],' and changed the subject."

B.    **RECORDS REVIEW:**

1.    *Ventura County Star* article, 5/14/08, "Former Officer Won't Be Charged"

2.    Brian Ellison, memo dated 8/20/06 (1 page)

JUL-15-2008 08:15A FROM:S WILSON          1(818-879-0715          TO:18052700209          P.6

J.W. vs. County of Ventura
July 14, 2008
Page 5

3.  Ken Klopman, memo dated 9/6/06 (2 pages)

4.  Brian Ellison, memo dated 9/12/06 (6 pages)

5.  Oxnard Police Department Followup Report dated 2/18/07 (5 pages)

6.  Transcript of J.W. interview with Sharon Giles, 2/12/07 (53 pages)

7.  Justice Through DNA, DNA Reports 6/25/07 and 7/7/07 (9 pages)

8.  Oxnard Police Department Crime Report, 1/24/08 (14 pages)

9.  U.S. District Court, Central District, Complaint for Damages, 9/20/07 (18 pages)

10. Superior Care Pharmacy (2 pages)

11. U.S. District Court, Central District, Response to Interrogatories, City of Oxnard (7 pages), Martin Polo (5 pages), Martin Polo, Production of Documents (6 pages)

12. Youth Care/Pine Ridge Treatment Plans (12 pages)

13. Robin K. Weiner, Ph.D., Psychological Evaluation (13 pages)

14. Records of Youth Care/Pine Ridge typewritten and handwritten notes (142 pages)

15. Records of Vista Del Mar Hospital, nursing notes (54 pages), admission and discharge summaries (40 pages), and screener narrative, 10/28/06 (7 pages)

16. Deposition of J.W., Volumes 1 and 2, 5/7/08 and 5/8/08 (429 pages)

C.  **OTHER COURT CASES/COURT APPEARANCE:**

1.  *Schneider vs. Friedman*, L.A. Superior Court
2.  *People vs. Calvin Holt*, L.A. Superior Court
3.  *People vs. Acosta*, L.A. Superior Court
4.  *People vs. David Melendez*, L.A. Superior Court
5.  *People vs. Sharif Hawa*, L.A. Superior Court
6.  *People vs. Rivas*, L.A. Superior Court

JUL-16-2008 12:57P FROM:S WILSON          1(818-879-0715        TO:18052780289        P.2

**J.W. vs. County of Ventura**
July 14, 2008
Page 6

7. *Robin vs. Robin*, L.A. Superior Court
8. *Jackson vs. Jackson*, L.A. Superior Court
9. McQueen, L.A. Superior Court
10. Nichols (minors), Ventura Superior Court
11. Cavanaugh, L.A. Superior Court
12. *Bibi Bhola vs. Sercomp Corporation*
13. *Daniels vs. McDanna*
14. Ramon Comacho, L.A. Superior Court
15. Preshus Booker, Workers Compensation Appeals Board

D.   **CURRICULUM VITAE**

See attached.

Respectfully submitted,

Stephen J. Wilson, M.D.
Diplomate of the American Board
of Psychiatry and Neurology

SW:tn

# EXHIBIT "B"

**Maria T. Lymberis, M.D., D.L.F.A.P.A.**

*1500 Montana Ave., #204 / Santa Monica, CA 90403*
*(310) 451 3152*
*Fax: (310) 454 1039*
*E-Mail: maria@lymberis.com*

# Rule 26 Report

### Re:  J.W v. City of Oxnard

## (I)   Professional Qualifications

I am a licensed medical doctor in the state of California.  I am a Clinical Professor of Psychiatry at UCLA and certified by the American Board of Neurology and Psychiatry in both Psychiatry and Child & Adolescent Psychiatry.  I have been in full-time solo private practice in Los Angeles, California specializing in adult, child and adolescent psychiatry, psychoanalysis and psychotherapy continuously since 1970.  In addition to my full-time clinical practice, I have been professionally active as follows:

Starting in 1978, I have been involved in the practice of forensic psychiatry as follows:  I am an expert consultant for the Medical Board of California with special expertise in the area of Sexual Misconduct and a senior consultant in both the evaluation of physicians as to their psychiatric status and fitness for practice and in the review of psychiatrists practice through the review of cases submitted by the Medical Board to ensure that the psychiatric care provided to the involved patient is within the standard of care.  In addition to my work for the Medical Board, I have been involved in psychiatric peer review. In the 1970's I was a peer reviewer in the American Psychiatric Association's Peer Review program.  Starting in the 1980's to 2007, I have been an expert peer reviewer in the Medicare program, (currently administered by LUMETRA).  In addition, since the 1980's, I am one of the Physician Expert Reviewers for my medical malpractice insurance, CAP-MPT.  I also serve as a member of the CAP-MPT Education Committee involved in developing programs for the prevention of psychiatric malpractice and as a psychiatric expert reviewer in psychiatric malpractice cases handled by CAP-MPT.

Since 1986 I have testified as a psychiatric expert for both defense and plaintiff in numerous psychiatric malpractice cases not connected with my malpractice insurance. I have served as a psychiatric expert in a limited number of criminal cases primarily involving adolescents and in several divorce and child custody cases as well as in numerous sexual misconduct and sexual harassment civil cases.

## (II) Education and Professional Training

I attended Rutgers University, Douglass College from where I graduated in 1960 with a BA in philosophy and pre-med. In 1964, I graduated from USC School of Medicine. I completed a one-year medical Internship at Mount Sinai Hospital in Los Angeles, CA, followed by a year of Neurology Residency at Mount Sinai Hospital in New York City; and completed my psychiatric residency at Albert Einstein Bronx Municipal Hospital in New York City in 1968. I completed my Child and Adolescent Psychiatric Fellowship from UCLA NPI in 1970 and graduated from the Los Angeles Psychoanalytic Institute in 1978.

Since the 1970s I have been involved in psychiatric education. I am a Clinical Professor of Psychiatry at UCLA where I have been involved in teaching child psychiatry fellows and psychiatric residents since 1970. In addition, I was Senior Faculty and taught from 1978-2000, psychoanalysis at the Los Angeles Psychoanalytic Institute. Since 1978 to the present, I have been teaching at the Graduate Center for Child Development and Psychotherapy, where I am a member of the Board and Senior Faculty. I have been teaching psychiatric and medical ethics to countless medical organizations, hospitals and teaching institutes and professional meetings, both in the US and abroad. In addition to ethics, my teaching focuses specifically on child and adolescent development, the impact of divorce on children and adolescents, on the treatment of depression with combined pharmacotherapy with psychotherapy (especially in women, children & adolescents) as well as in dynamic psychotherapy (individual, family and children/adolescents). For a complete listing of my teaching and publications see my attached CV.

## (III) Psychiatric Leadership Involvement:

Since the 1970's I have been involved in my profession as well as in other medical and mental health organizations (see my CV) and have held numerous positions of leadership. I have chaired numerous committees, both locally and nationally. I have held many elected

offices (both locally and nationally) including President of Southern California Psychiatric Society (SCPS), Trustee at Large of the American Psychiatric Association (APA) and Treasurer of the APA, to just mention the pertinent ones. From 2000 to 2006, I chaired the Investment Oversight Committee of the APA and since 2006 the Elections Committee of the APA.  Currently I am a Delegate from the Los Angeles California Medical Association to the California Medical Association's House of Delegates. In addition, I am President of the Psychiatric Education and Research Foundation, (PER), which was established by SCPS, and I am Acting Director of the Hellenic American Psychiatric Association, which I founded in 1999 and served as its first President (1999-2001).  I served as Chair of the APA Ethics Subcommittee on the Education of Psychiatrists on Ethical Issues in the 1990s and as a member in the Ethics Committee of several other medical, psychiatric and mental health professional organizations. Among these are Los Angeles Psychoanalytic Society & Institute, the American Academy of Psychiatry and the Law, the Los Angeles County Medical Association and the California Medical Association. I served in the California Senate Task Force on Psychotherapist Patient Sexual involvement in 1987 representing the psychiatric profession. I have been lecturing since the 1980s on Medical Ethics with special emphasis on Sexual Harassment & Misconduct in Medicine & Psychiatry.

My work has been recognized by the American Psychiatric Association, where I was elected Distinguished Life Fellow and by the American College of Psychiatrists where I was elected Fellow. I am also the recipient of other honors as noted in my CV

On the basis of my education, training, professional experience in both practice and teaching, I am qualified to render psychiatric expert opinions under oath regarding the medical-psychiatric condition of the plaintiff: J.W. in the J.W. v. City of Oxnard Case

## (IV) Compensation as an Expert in this case

My hourly fee for examination and consultation is **$600.00 per hour** and for record review is **$400.00** per hour **with a $4,000.00 retainer.** The fee for testimony by deposition or court appearance is **$3,000.00 per half-day** and **$6,000.00 per full day** with **a minimum of half day ($3,000.00), paid in advance at the time of scheduling.**  Once an examination or deposition is scheduled, there will be a cancellation charge for the time reserved of **$1,500.00**. The full amount will be charged unless the cancellation occurs within **five**

**(5)** business days of the scheduled event and the case is rescheduled for another agreed upon date.

## (V)   Recent Testimony Cases

Joseph M. Abramowitz v. National Life Insurance Co., et al.
US District Court, Southern District. Case # CV00906W

Khaim Koifman v. Marina Sharkansky
Superior Court, County of Los Angeles, Case #BD 325-939

Jane Doe v. Pasadena Unified School District
Superior Court, County of Los Angeles, Case # BC 303-182

Toriz v. T. E. Construction, Inc
Superior Court, Orange County, Case # OCSC 03-CC10845

Oliai v Coram Healthcare Corp et al.,
US District Court, Central District of California-Western District,
Case #No. CV-99-08032 AHM(CWx)

## (VI)   Records Reviewed

My psychiatric opinions on this case are based on the following:

a) My psychiatric examination of the plaintiff JW for 2 hours by phone on 8/12/08

b) My personal interview of JW's mother for 30 minutes by phone on 8/13/08

c) My review of the following documents supplied to me by attorneys Lorant and Trock:

1) Deposition of Julia Wilson Volumes I & II (print & Video)

2) Deposition of Diane Ruth Jackson

3) Autobiography of JW

4) Defendant Martin Polo's Disclosure of Expert Witnesses (Included Stephen J Wilson, MD's Psychiatric Evaluation of JW dated 4/8/08 and Rule 26 Report dated 7/14/08)

5) Oxnard Police Department Reports
P167-168 dated 2/20/07
P1010- 1090
P1001-1009
P158-161
P183-184

6) Interview of JW by Detective Sharon Giles dated 2/12/07

7) Psychological Evaluation of JW by Robin K. Weiner, PhD
dated 11/25/07

8) Psychiatric Treatment records of JW from various
psychiatric treatment facilities including Youth Care Pine
Ridge in Utah and Vista Del Mar in Ca: P 828-1074

9) Suspected Child Abuse Report by Vicki Turnbull, RN dated
10/28/06 re JW 's experience with the police office in 8/06
P 1075-1080

10) Interview of Anne Jones dated 8/29/07 P 3036-3079

11) TimeLine JW v Oxnard PD & Polo
by Attorney Lorant

## (VII) Psychiatric Opinions

### 1) Issue of reliability and credibility of plaintiff JW before the rape by police officer on 8/15/08

JW had a relatively normal development until around age 7 years of
age. Several factors contributed to her emerging psychological
distress: early puberty, high intelligence and the progressively
deteriorating family dysfunction due to an escalating marital conflict
which resulted in the divorce of her parents when JW was 7 years old.
These conditions resulted in the derailment of JW's psychological
development and function. JW began to be alienated from both of her
parents, to become withdrawn and increasingly depressed, defiant and
rebellious. Her relationship with her parents became increasingly
conflicted and mutually distrustful with numerous misunderstandings,
blaming and distrust. Her behavior became disorganized as she
became overwhelmed and unable to process the complexities of her
family and her own internal psychological function. She used primitive
defense mechanisms such as denial, avoidance and acting out in order

to both express and avoid conflict. Such defenses are characteristic of children and are an expression of their psychological immaturity. In this case it is also a reflection of the family pathology.

I do not consider JW to be a social deviant or psychopath who lies and fabricates. All evidence indicates she is a reliable and credible historian **provided** she is in a safe, supportive, trustworthy environment.

## 2) Issues regarding JW's sexual abuse by police officer on 8/15/06

It is normative for victims of sexual abuse to deny and have great difficulty disclosing their abuse.  JW characteristically began to slowly disclose her experience approximately two weeks after the event of 8/15/06.
There are two elements to her disclosure: one nonverbal disclosure in action, acting out behavior, and the other verbal disclosure.
JW's behavior following the rape of 8/15/06 severely deteriorated with a dramatic escalation into an indiscriminate sexual acting out behavior with multiple rape incidents. These were re enactments and an expression of her traumatic abuse by the police officer whom she trusted and from whom she expected protection and help. Such behavioral re enactments are characteristic of sexually abused children and youths. JW was unable to process her 8/15/06 experience at that time. She is still trying to do so in her treatment since 11/06

There is a dispute as to JW's credibility regarding her claim of sexual abuse (rape) by the police officer on 8/15/06. My opinion that JW is credible is based on a number of factors. The statement of Anne Jones who described similar details in her sexual encounter with the same police officer in the very same location as JW has described, is in my view a major collaborating evidence of JW's credibility. In addition, JW's behavior since the 8/15/06 event, including her response to her treatment to date is consistent with that of juvenile victims of sexual abuse. Finally, it is not reasonable to consider JW as having fabricated such a traumatic event as rape by a police officer and giving so many unique details. JW while appearing physically mature far above her chronological age she was and still is psychologically very immature and prone to regressive states because of her psychiatric problems. She could not possibly have made up such a unique detailed scenario. In all the records I reviewed JW's story is consistently clear and the same with no fabrications, elaborations or exaggerations.

**d) Issues around the consequences of the sexual abuse of JW by police officer on 8/15/06**

JW had clear evidence of psychiatric problems starting at age 7 years when her parents got divorced. However, the contact with the police officer on 8/14/06 occurred at a time when JW was in great trouble and in clear need for safety, help and guidance in mastering her problems. Her experiences with the police officer on 8/15/06 profoundly aggravated her psychiatric problems and lead to a severe disorganization that rendered her gravely disabled.

JW is gifted in cognitive and intellectual areas and had a relatively good foundation in her early childhood. These positive elements are reflected in her superior intellectual abilities and in her earlier superior academic performance. However, the events of 8/15/06 have resulted in a severe psychiatric disturbance characterized by dissociative episodes, severe regressive states, high emotional lability and a severe overall emotional dysregulation. The resultant severe psychiatric condition compromised her over all function including her cognitive function and made it impossible for her to utilize consistently and effectively her superior intellectual abilities in an adaptive and constructive way.
It is the task of treatment to help her harness her strengths in the service of repairing her damaged functions, restoring her development and helping her recovery from her traumas.

JW will require a highly structured safe therapeutic environment for a minimum of 8 to 10 years to achieve these treatment objectives. She can not be expected to function independently any time soon because of the high risk of relapse associated with her severe post traumatic stress disorder, her comorbid psychiatric conditions, her age and the severity of her dysregulation. Assuming JW is able to recover and can resume a healthy developmental path, she still will require access to psychiatric treatment for the rest of her life. Her prognosis is fair given her intellectual gifts, her parents' participation in the treatment, their support of her and her response to the treatment since 11/06. Specifically, her ability to participate and improve with the treatment being offered to her since 11/06

I declare under the penalty of perjury under the laws of the State of California that the above is true and correct.
Executed in Los Angeles, CA on August 13, 2008

Maria T. Lymberis, MD
Clinical Professor of Psychiatry, UCLA

# EXHIBIT "C"

1   Etan Z. Lorant, Esq., SBN: 108820
    LAW OFFICES OF ETAN Z. LORANT
2   17525 Ventura Boulevard, Suite 201
    Encino, California 91316
3   (818) 990-3990

4

5   Attorneys for Plaintiff,
    J.W., A Minor, through her Guardian Ad Litem, MARK WILSON
6

7

8                     UNITED STATES DISTRICT COURT

9                     CENTRAL DISTRICT OF CALIFORNIA

10

11  J.W. A Minor, through her Guardian      )   CASE NO.: CV 07-06191
    Ad Litem, MARK WILSON                   )              GPS(SHx)
12                                          )
            Plaintiffs,                     )
13                                          )   PLAINTIFF'S
                                            )   DESIGNATION OF
14  vs.                                     )   EXPERT WITNESSES
                                            )   PURSUANT TO
15  CITY OF OXNARD, MARTIN POLO,            )   FRCP 26(a)(2)(C)
    and DOES 1 through 10,Inclusive,        )
16                                          )   Pre-Trial Conference: 9/22/08
                                            )   Trial: 10/14/2008
17          Defendants.                     )
                                            )
18                                          )
                                            )
19                                          )
                                            )
20

21      TO EACH PARTY AND EACH ATTORNEY OF RECORD IN THIS

22  ACTION:

23      Plaintiff J.W., A Minor, through her Guardian Ad Litem, MARK WILSON,

24  hereby identifies the following individuals who will be called to testify as rebuttal

25

26  expert witnesses at the trial of this action pursuant to Federal Rules of Civil

27  Procedure Rule 26(a)(2)(C):

28
                                    -1-

PLAINTIFF'S DESIGNATION OF          CASE NO.: CV 07-06191 GPS(SHx)
EXPERT WITNESSES PURSUANT
TO FRCP 26(a)(2)(C)

RETAINED EXPERTS

1. Maria T. Lymberis, M.D., F.A.P.A., 1500 Montana Avenue #204, Santa Monica, CA 90403, Telephone (310) 451-3152, Fax: (310) 454-1039

2. Roger A. Clark, 10207 Molino Road, Santee, CA 92071, Telephone: (208) 351-2458, Fax: (619) 258-0045

TREATING HEALTH CARE PROVIDERS

3. Ronald D. Sager, M.D., 16311 Ventura Blvd. #1050, Encino, CA 91436 (818) 783-3835

4. Robin Weiner, M.D., 4010 S. Highland Drive #02, Salt Lake City, Utah 84124 (435) 425-2234

5. Diane Jackson, C/O Youth Care,  P.O. Box 909, Draper, Utah 84020 Telephone (801) 572-6989

6. Steven S. Ruths, M.D. 1304 E. Main street, Suite "D", Ventura, CA 93001

DNA EXPERT

7. Kelly Brockhohn, Crime Scene Technologies, 11125 Flintkote Avenue, Suite A, san Diego, CA 92121, (858) 550-1700; 3950 Mahalia Avenue #G22, San Diego, CA 92122, (571) 331-3632

Pursuant to Federal Rules of Civil Procedure, Rule 26(a)(2)(C), Plaintiff attach hereto a copy of the written report prepared by the *retained expert*, Maria T. Lymberis, M.D., F.A.P.A., and the resume of *retained expert* Roger A. Clark

DATED: August 14, 2008            LAW OFFICES OF ETAN Z. LORANT

By: _____
ETAN Z. LORANT, ESQ.
Attorneys for Plaintiff,
J.W. , A Minor, through her Guardian
Ad Litem, MARK WILSON

-2-

## PROOF OF SERVICE

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT**

**J.W., a minor through her Guardian Ad Litem Mark Wilson vs. City of**

**Oxnard, Martin Polo, and DOES 1 through 10, Inclusive**

**U.S.D.C. CASE NUMBER:  CV 07-06191 GPS (SHx)**

I, Yael Trock, am employed in the aforesaid county, State of California; I am over the age of 18 and not a party to the within action; my business address is 16530 Ventura Boulevard, Suite 208, Encino, CA 91436.

On **August 14, 2008**, I served the foregoing document described as **PLAINTIFF'S DESIGNATION OF EXPERT WITNESSES** on all of the following interested parties to this action:

### SEE ATTACHED SERVICE LIST

[X]   **BY PERSONAL SERVICE:**  By personally serving the people listed on the attached list at 21243 Ventura Blvd. #230, Woodland hills, CA 91364 .

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct. Executed on **August 14, 2008**, at Los Angeles, California.

_____
YAEL TROCK

-3-

# LIST OF NAMES SERVED

Jeffrey Held, Esq.
LAW OFFICES OF ALAN E. WISOTSKY
300 Esplanade Drive, Suite 1500
Oxnard, California 93036
Tel (805) 278-0920
Fax (805) 278-0289

Steven J. Rothans, Esq.
~~Jill W. Babington, Esq.~~
CARPENTER, ROTHANS & DUMONT
888 S. Figueroa Street, Ste. 1960
Los Angeles, California 90017
Tel (213) 228-0400
Fax (213) 228-0401

-4-

EXHIBIT "D"

1                    UNITED STATES DISTRICT COURT

2                   CENTRAL DISTRICT OF CALIFORNIA

3

4

5    J.W., a minor, through her        )
     Guardian ad Litem, MARK WILSON;   )    CERTIFIED
     MARK D. WILSON, as Guardian ad    )    COPY
6    Litem of J.W.,                     )

7              Plaintiffs,             )
     Vs.                               )   No. CV 07-06191 GPs(SHx)

8                                      )
     CITY OF OXNARD, MARTIN POLO, and  )
9    DOES 1 through 10, inclusive,     )

10                                     )
              Defendants.             )
11   _____   )

12

13

14

15

16        DEPOSITION OF:   RONALD SAGER, M.D.

17        DATE:            Friday, July 25, 2008

18        LOCATION:        400 Esplanade Drive
                           Suite 302
19                         Oxnard, California

20

21

22

23

24   REPORTED BY:    SALLY FARKAS LEFTON, CSR 6461

25

J.W. v. CITY OF OXNARD  RONALD SAGER, M.D. I                    7/25/2008

1       Q   In your experience, is it true that some of the

2   minors who get raped don't report it immediately as it

3   happened?

4       A   Correct.  This little girl did not report it to

5   anyone.  She was embarrassed.  She ran home to her

6   grandmother, took a shower, and didn't report it to anyone

7   for at least -- it must have been just recently.

8       Q   So if a 14 year old girl doesn't report anything

9   to her mother for a couple of months, maybe three, four

10  weeks, that would be normal?

11      MS. BABINGTON:  Objection.  Vague, ambiguous,

12  incomplete hypothetical.

13  BY MR. LORANT:

14      Q   In your experience, if a 14 year old girl --

15      A   I'd say --

16      Q   Let me rephrase it to a 12 year old girl, because

17  she was 12 years old at the time.

18          If a 12 year old girl doesn't report it to her

19  mother for two, three or four weeks --

20      MS. BABINGTON:  Objection.  Incomplete hypothetical.

21  BY MR. LORANT:

22      Q   The question is, in your experience as a doctor,

23  if a 12 year old minor does not report immediately that

24  something happened, that she was raped, and she waits two

25  or three weeks and tells her mother something bad happened

36

1   with somebody, and then later on she reports it to somebody

2   else saying "somebody did something bad to me," that would

3   not be an abnormal situation; is that correct?

4        MS. BABINGTON:  Same objections.

5        THE WITNESS:  It's common, let's say, not to report

6   it.  Abnormal?  What's normal?

7   BY MR. LORANT:

8        Q    I shouldn't have used the word "abnormal."

9             I have no more questions.

10

11                    EXAMINATION (Continued)

12   BY MR. HELD:

13        Q    I just have one clarification.

14             Does it also sometimes happen that young girls who

15   are sexually violated do report the sexual violation

16   promptly?

17        A    Do they?  I'd say yes, they do.

18        Q    Then I will propose the following stipulation, if

19   everyone has completed their examination of Dr. Sager.

20             I propose to stipulate that, according to the

21   Federal Rules of Civil Procedure, the reporter and her

22   agency be relieved of any responsibility to maintain

23   custody or control of the original of Dr. Sager's

24   deposition transcript; in lieu whereof, I or my office will

25   maintain that custody or control; we will produce it on

37

# EXHIBIT "E"

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4   J.W., A MINOR, THROUGH HER      )
     GUARDIAN AD LITEM, MARK WILSON, )
 5                                   )
            PLAINTIFFS,              )
 6                                   ) NO. CV 07-06191
        VS.                         )      GPS(SHX)
 7                                   )
     CITY OF OXNARD, MARTIN POLO, AND)
 8   DOES 1 THROUGH 10, INCLUSIVE,   )
                                     )
 9          DEFENDANTS.              )
     --------------------------------)
10

11

12

13

14              DEPOSITION OF SENIOR OFFICER KENNETH

15              KLOPMAN, TAKEN ON BEHALF OF THE

16              PLAINTIFF, ON TUESDAY, JULY 29, 2008,

17              AT 1:00 P.M., AT 21243 VENTURA

18              BOULEVARD, SUITE 230, WOODLAND HILLS,

19              CALIFORNIA, BEFORE NATALIE

20              BALLESTERO, CSR NO. 10149, PURSUANT

21              TO NOTICE.

22

23

24

25
                                              2
```

1    AMBIGUOUS.  VAGUE AND AMBIGUOUS AS TO THE TERM

2    "IMMEDIATELY" AND "REPORT."

3    BY MR. LORANT:

4         Q    DO YOU UNDERSTAND THE QUESTION?

5         THE WITNESS:  WELL, COULD YOU REPEAT IT.  I

6    WANT TO MAKE SURE I ANSWER ACCURATELY.

7         MS. TROCK:  LET'S GO OFF THE RECORD FOR JUST

8    A MOMENT.

9              (WHEREUPON A DISCUSSION

10             WAS HELD OFF THE RECORD.)

11             (THE RECORD WAS READ AS FOLLOWS:

12                  "Q  IN YOUR EXPERIENCE AS A

13                  DETECTIVE WHO WAS HANDLING

14                  JUVENILE MINOR VICTIMS OF A

15                  SEXUAL OFFENSE, DID ALL OF

16                  THOSE MINORS IMMEDIATELY

17                  REPORT THE CRIME WITHIN A FEW

18                  HOURS.")

19         THE WITNESS:  NO, IT WAS VERY COMMON FOR ANY

20    SEXUAL ASSAULT VICTIM TO DELAY REPORTING.

21    BY MR. LORANT:

22         Q    BY HOW MUCH?

23         A    SOMETIMES TWO DECADES.

24         Q    AND YOU'RE TALKING ABOUT THE CATHOLIC

25    CHURCH REPORTING; IS THAT IT?

57